UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CHARLES R. OHRNBERGER,

                          Plaintiff,                        **MEMORANDUM & ORDER**

     -against-
                                                 15-CV-2714 (DRH)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                          Defendant.
-------------------------------------------------------X

**APPEARANCES:**

**ANTHONY MICHAEL CAMISA, P.C.**
323 Willis Avenue
Mineola, New York 11501
By: Anthony Michael Camisa, Esq.

**ROBERT L. CAPERS**
**UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Rachel Balaban, AUSA

**HURLEY, Senior District Judge:**

       Plaintiff Charles Robert Ohrnberger ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "Defendant") which denied his claim for disability benefits.

Presently before the Court is plaintiff's motion and defendant's cross-motion for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reason discussed below,

plaintiff's motion is denied and defendant's motion is granted.

# BACKGROUND

## I.     Procedural Background

Plaintiff filed an application for disability benefits on July 18, 2012, alleging disability

due to bipolar disorder since March 28, 2012. (Tr. 25, 89-90, 110.)[1]  His application was denied

and he then requested a hearing. (Tr. 56-68.) On October 7, 2013, Plaintiff, who was represented

by counsel, appeared and testified at a hearing before ALJ April M. Wexler. (Tr. 37-52.) By

Notice of Decision-Unfavorable, dated October 24, 2013, ALJ Wexler denied plaintiff's claims

for disability. (Tr. 22-36.) Plaintiff appealed the October 24, 2013 decision and in support of

appeal submitted a letter of argument and additional medical evidence. (Tr. 136-38 & 232-36.)

On March 27, 2015, the Appeals Council denied review. (Tr. 1-6.) The ALJ's decision therefore

became the Commissioner's final decision. This action followed.

## II.     Factual Background

### A.     Non-Medical Evidence

Plaintiff was fifty-three years old at the time he testified at his administrative hearing. (Tr.

41.) He completed two years of college. (Tr. 42.) For thirty-two years he worked at Verizon as a

central office technician, which he described as "very high pressure." (Tr. 40, 42.) At Verizon,

Plaintiff worked from a desk in a disaster recovery center rerouting traffic, restoring Verizon's

network, and offering support on how to operate certain equipment. (Tr. 42.) He retired after

thirty-two years because the job became "overwhelming." (Tr. 43.) Plaintiff testified that the job

induced panic attacks, making it hard to work. *Id*. He took a lump sum from Verizon and does

not receive a pension. (Tr. 41). He did not contemplate getting a less stressful job after retirement

---

[1] "Tr." refers to the administrative record filed in this case.

because he was not sure he would be qualified to do much else. (Tr. 43.)

Plaintiff testified he lives with his wife of twenty-seven years and their eldest son. (Tr. 41, 46.) He spends a typical day "[m]aking the bed, doing [his] laundry, watching a lot of television . . . [r]unning errands, [and] shopping." (Tr. 45.) He cooks, drives daily, and, on special occasions, socializes with his wife's friends. (Tr. 46, 120.) He does not have friends of his own because his disorder makes keeping friends difficult. (Tr. 46.) He has attempted suicide twice, once about 1995 and again about 2008. (Tr. 47.) He stated he has been fairly stable for the past five years (Tr. 48); his condition was "under control with medication" but if he works "the stress aggravates it" and he becomes depressed or maniac. (Tr. 45.) Plaintiff's attorney pointed out that Plaintiff was "suspended [from Verizon] on approximately five to six occasions due to side effects . . . from his disease." (Tr. 40.)

In a prior written statement dated September 24, 2012, Plaintiff complained of trouble sleeping through the night without medicine and that he sometimes needs to be reminded to bathe. (Tr. 118-19.) Plaintiff also stated he is easily distracted, but is able to finish what he starts and follow spoken and written instructions. Additionally, he has no problem getting along with authority figures, such as bosses, and has never lost a job because of problems getting along with people. (Tr. 124.)

Robert D'Amillo, a vocational expert, testified at the hearing about a hypothetical individual with the same age, education, and past work as Plaintiff. (Tr. 49.) The hypothetical individual was limited to low stress jobs, meaning no work at a fixed production, with work checked at the end of the workday or workweek, rather than hourly or throughout the day. (Tr. 49-50.) D'Amillo opined that the hypothetical individual could not perform Plaintiff's past work,

but could perform other types of jobs in the economy such as working as a microfilm mounter, a document prep worker, or a bagger. (Tr. 49.) He also testified that, should the hypothetical worker be off task 15 percent of the workday, he or she could not perform any job in the local or national economy. (Tr. 50.)

B. **Medical Evidence - Treating Sources**

Dr. Gennaro P. Ingenito, M.D.

On October 28, 2002, Plaintiff began seeing his initial psychiatrist, Dr. Ingenito. (Tr. 141-42.) Plaintiff's chief complaint was that he was suffering from depression for most of his life. *Id*. Dr. Ingenito noted Plaintiff had several hospitalizations, one as a result of a suicide attempt. *Id*. Dr. Ingenito treated Plaintiff for his psychiatric issues for the next ten years, until Dr. Ingenito retired. (Tr. 141-170.) However, after the alleged onset date, Dr. Ingenito only had two contacts with Plaintiff. (Tr. 137, 170.) On April 19, 2012, Plaintiff informed Dr. Ingenito that he had retired from his job at Verizon and was prescribed Abilify, Wellbutrin, Lamictal, and Trazodone (Tr. 170.) On August 7, 2012, Plaintiff phoned Dr. Ingenito requesting his medical records be released for purposes of these proceedings. *Id*.

Dr. Nancy Tice, D.O.

On January 30, 2013, Plaintiff began seeing Nancy Tice, D.O. (Tr. 196-99.) Dr. Tice noted Plaintiff's lengthy psychiatric history, beginning on September 7, 1987, when Plaintiff suffered an aneurysm burst causing a traumatic cerebral hemorrhage (Tr. 196.) Currently, "[plaintiff] has no cognitive deficits from the injury." *Id*. Dr. Tice made note of three total suicide attempts, all which occurred after the aneurysm burst but before the alleged onset date. *Id*. In the first attempt, Plaintiff purposely ran his car off the Northern State Parkway into trees. *Id*. Next,

Plaintiff was preparing to jump off the Manhattan Bridge but was talked down by a nurse. *Id*. In his third attempt, Plaintiff was hospitalized for attempting to hang himself. *Id*. At age thirty-three, about six years after the aneurysm burst, Plaintiff was diagnosed with depression. (Tr. 197.) Dr. Tice also noted Plaintiff's psychiatric history before the aneurysm burst. *Id*. As a teenager, Plaintiff suffered from bulimia disorder. *Id*. He would vomit daily after eating a large dinner, but stopped this behavior at age nineteen. *Id*. He then became very active. *Id*.

Dr. Tice's notes state that Plaintiff "has been stable for five years now" and listed the four medications he was currently prescribed: Abilify, Wellbutrin, Tradazone, and Lamictal. They also state that although Hurricane Sandy destroyed the first floor of his house, the stress of the hurricane damage did not cause a setback. Dr. Tice diagnosed Plaintiff with bipolar type 1 disorder, most recent episode mixed, in full remission. On mental status examination, Dr. Tice stated that Plaintiff presented "as calm, friendly, attentive, casually groomed, overweight, and relaxed." Plaintiff's mood presented as normal, with his affect appropriate, full range, and congruent with mood. There were "no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." All associations were intact, thinking was logical, and thought content was appropriate. Plaintiff did not appear suicidal. His cognitive functioning was "intact and age appropriate." Plaintiff's short and long term memory were intact, he was fully oriented, his vocabulary and knowledge were within the normal range, his social judgment was intact and there were no signs of anxiety, hyperactive difficulties, or attention difficulties. Overall, Plaintiff "was cooperative and attentive with no gross behavioral abnormalities." Dr. Tice summed up the visit as, "52 year old man bipolar disorder multiple hospitalizations now stable on medication seeks treatment because his psychiatrist is retiring."

Dr. Tice assessed a Global Assessment of Functioning (GAF) score of 60.[2] (Tr. 196-99.)

After missing his second appointment, Plaintiff next saw Dr. Tice on April 3, 2013 after being reminded of the appointment. He had stopped taking his medication, except for Wellbutrin, had been overeating and gained weight, had bitten his nails down very short, and was financially stressed because of house renovations made necessary by Hurricane Sandy. He did take a trip to Arizona which he enjoyed. Plaintiff denied being inattentive, impulsive, disorganized, or having any other symptoms of ADHD. He did not describe any symptoms of anxiety, depression, mania, bulimia or other eating disorders. His mental status examination was unchanged, except that his mood could not be assessed. Dr. Tice repeated her diagnosis of bipolar I disorder, most recent episode mixed, in full remission, with a GAF score of 60. Dr. Tice "STRONGLY ENCOURAGED" Plaintiff to restart Abilify, Lamictal, and Tradazone, but to lower the Tradazone dose so Plaintiff would no longer feel sedated. (Tr. 200-01.)

On April 12, 2013, Dr. Tice filled out a Mental Residual Functional Capacity Questionnaire. She wrote that Plaintiff is seen monthly for supportive therapy and medication, that Plaintiff responds well when he is compliant, and has a history of "severe" bipolar disorder with multiple hospitalizations and suicide attempts, now mixed compliance with medication.

---

[2] GAF was a score that indicates a clinician's overall assessment of an individual's psychological, social, and occupational functioning at the time of the evaluation. *Petrie v. Astrue*, 412 Fed. App'x 401, 406 n.2 (2d Cir. 2011) (summary order) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 376-77 (4th ed., text revision, 2000)). A GAF score of 51-60 was used to indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34. A GAF score of 61-70 was used to indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning. In 2013, the American Psychiatric Acssociation dropped the use of the FAG scale noting its 'conceptual lack of clarity" and "questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM V) (5th ed. 2013).

Plaintiff's prognosis was "guarded." Dr. Tice identified Plaintiff's symptoms to include appetite disturbance with weight change, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities, and bipolar disorder with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. As to the mental capability to perform work-related activities on a day-to-day basis in a regular work setting, Dr. Tice opined that Plaintiff was seriously limited[3] in remembering work-like procedures, understanding and remembering very short and simple instructions, asking simple questions or requesting assistance, and being aware of normal hazards and taking appropriate procedures. She further opined that Plaintiff was unable to meet competitive standards[4] in the following areas: carrying out very short and simple instructions, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, understanding and remember detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, and traveling in unfamiliar

---

[3] "Seriously limited" means the ability to function in a particular area is seriously limited and less than satisfactory, but not precluded in all circumstances. Tr. 205.

[4] "Unable to meet competitive standards" refers to not able to perform an activity appropriately, effectively, and on a sustained basis in a regular work setting. Tr. 205.

places. Lastly, Dr. Tice opined that Plaintiff has no useful ability to function in the following areas: maintaining attention for two hour segment, maintaining regular attendance and being punctual with customary work expectations, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, dealing with normal work stress, dealing with stress of semiskilled and skilled work, and using public transportation. Dr. Tice handwrote that Plaintiff's "physical and psychological illness makes being able to do any kind of work impossible," and "[t]he stress of the work and rules and standards will likely put [Plaintiff] back in the hospital." (Tr. 204-07.)

Plaintiff next saw Dr. Tice on July 18, 2013. The appointment focused on Plaintiff's frustration with problems relating to the renovation of his home and the pressure he was feeling from his family. Plaintiff expressed feelings of sadness as he was not able to go out and enjoy his birthday or the Fourth of July, and had spent a couple of days spontaneously crying. Dr. Tice's mental status examination findings were largely the same as prior examinations. Her diagnosis and assessment were unchanged. She noted that Plaintiff never started Lamictal and was not taking the Trazadone, but was stable on Wellbutrin and Abilify. (Tr. 212-14.)

By letter dated October 8, 2013, Dr. Tice clarified her use of the word "remission" in her January 30, 2013 evaluation of Plaintiff. At the time of her January 30 appointment with Plaintiff, Plaintiff was neither actively manic or depressive, but, over the course of their time together, Plaintiff had periods of "exacerbation." Dr. Tice stated "[t]he only reason [Plaintiff] is able to function as well as he does is because his daily life is free from avoidable stress such as

the pressure of a job," and "[h]is working in any capacity will put his health in jeopardy." Tr. 215.

Subsequent to the ALJ's decision, plaintiff submitted additional progress notes from Dr. Tice dated October 30, 2013, November 27, 2013, December 23, 2013, February 12, 2014, February 26, 2014, March 26, 2014 and April 4, 2014, as well as another Mental Residual Functional Capacity Questionnaire (Tr. 232-36). The February 12, 2014 notes indicate that plaintiff has signs of mild depression (Tr. 223) and the March 26, 2014 and April 4, 2016 notes indicated he had signs of moderate depression (Tr. 227, 229.). In the remaining notes, Dr. Tice observed that plaintiff was doing well with no signs of depression or manic process. (Tr. 216, 218, 220, 225.)

### C.    Consultative Medical Evidence

#### Dr. Paul Herman, Ph.D.

On October 3, 2012, Plaintiff underwent an Administration-requested psychiatric evaluation conducted by Dr. Paul Herman, Ph.D. (Tr. 171-74.) Dr. Herman initially noted that Plaintiff is a 52-year old married male who lives with his spouse and three children. He has two years of college, and worked for thirty-two years as a central office technician retiring primarily due to medical issues. Dr. Herman further noted that Plaintiff reported being hospitalized for psychiatric reasons on three occasions from 1995-2008, that he had been in intermittent outpatient treatment since 1995, and is currently seeing a psychiatrist and prescribed Abilify, Wellbutrin, Lamictal, and Trazodone. Plaintiff reported that currently he has difficulty falling asleep, and wakes up several times throughout the night. He had increased appetite, which is usually an indication that he is starting to get depressed. Plaintiff's last significant depressive

episode was in 2008, and his last manic episode was about eight years ago. Plaintiff's manic episodes include decreased sleep, erratic behavior, disorganized poor judgment, risky sexual encounters, piercings, and spending a lot of money. Plaintiff's depressive episodes include erratic sleep pattern, low mood, and decreased functional activity. The medication Plaintiff was prescribed is somewhat helpful in these areas. Plaintiff has a family history of mental illness and substance abuse. (Tr. 171-72.)

On mental status examination, Plaintiff was found to be cooperative with adequate social skills. He was adequately groomed and his posture, behavior, and eye contact were all within normal limits. His speech and language were also within normal limits. Thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. His mood was neutral and his affect was appropriate; he was oriented and his attention and concentration were intact. Plaintiff's recent memory skills were mixed, but his remote memory skills were intact. His cognitive functioning was appropriate. Dr. Herman rated Plaintiff's insight and judgment as fair, with the possibility of ranging to poor. Tr. 172-73.

Dr. Herman stated that Plaintiff reported no significant difficulties with activities of daily living related to psychological or psychiatric issues, but medical issues could interfere in this area. Dr. Herman also noted that Plaintiff does not have friends, but has good family relationships. Plaintiff regularly watches television, spends time with his family, and helps out around the house when his medical issues so permitted him. Tr. 173.

Dr. Herman opined that Plaintiff appeared capable of the following vocational functions: following and understanding simple directions and instructions, performing simple tasks, maintaining attention and concentration, maintain a regular schedule, learning new tasks,

performing complex tasks with which he is familiar, making appropriate decisions, relating

adequately with others, and appropriately dealing with others and with stress. Dr. Herman stated

that "the results of the examination appear to be consistent with psychiatric problems, but in and

of themselves, they do not appear to be significant enough to interfere with the claimant's ability

to function on a daily basis." Dr. Herman diagnosed Plaintiff with bipolar I disorder in remission

with medication. He recommended that Plaintiff continue with psychiatric treatment and stated

that Plaintiff might benefit from medical follow-up and vocational training and needs assistance

to manage funds when manic symptoms are present. Tr. 173-74.

<u>R. Mcclintock, Psychiatry</u>[5]

On October 17, 2012, a Psychiatric Review Technique was completed by medical

consultant R. Mcclintock, Psychiatry. After reviewing Plaintiff's records, Mcclintock stated that

Plaintiff has bipolar I disorder in sustained remission, and that the impairment was not severe.

Mcclintock opined that Plaintiff has no restriction of activities of daily living, no difficulties in

maintaining social functioning, concentration, persistence, or pace, and no repeated episodes of

extended deterioration. Mcclintock stated that Plaintiff's retirement from Verizon was in no way

related to his bipolar disorder. He concluded that there was no evidence of any psych-related

functional limitations in Plaintiff's records. (Tr. 175-90.)

## DISCUSSION

**I.      Standard of Review**

**A.      Review of the ALJ's Decision**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and

---

[5] While the nature of Mcclintock's qualifications are not further described in the record, neither party has questioned them.

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon

legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d

Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to

support a conclusion.'"  *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the

Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. §

405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*,

362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).  Thus the only

issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability

benefits was "based on legal error or is not supported by substantial evidence."  *Rosa*, 168 F.3d at

77.

      **B.**     **Eligibility for Disability Benefits**

            1.     *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant

must establish that he is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  The SSA further states that this impairment must be "of

such severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims.  See 20 C.F.R. § 404.1520.  This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### 2.     *The "Special Technique" for Evaluation of Mental Impairments*

The SSA "has promulgated additional regulations governing the evaluation . . . of the severity of mental impairments," that should be applied "at the second and third steps of the five-step framework . . . ." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008). This "special technique" requires "the reviewing authority to determine first whether the claimant has a

medically determinable mental impairment, [and if] there is such impairment, the reviewing

authority must rate the degree of functional limitation resulting from the impairment(s) in

accordance with paragraph C of the regulations, which specifies four broad functional areas: (1)

activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4)

episodes of decompensation." *Id*. (internal citations omitted); *see also* 20 C.F.R. § 404.1520a(b),

(c). "[I]f the degree of limitation in each of the first three areas is rated 'mild or better, and no

episodes of decompensation are identified . . . the reviewing authority . . . will conclude that the

claimant's mental impairment is not severe' and will deny benefits." *Kohler*, 546 F.3d at 266

(citing 20 C.F.R. § 404.1520a(d)(1)). However, if claimant's mental impairment or combination

of impairments is severe, "in order to determine whether the impairment meets or is equivalent in

severity to any listed mental disorder," the reviewing authority must "first compare the relevant

medical findings [along with] the functional limitation rating to the criteria of listed mental

disorders." *Id*. (citing § 404.1520a(d)(2)). If the mental impairment is equally severe to a listed

mental disorder, the "claimant will be found to be disabled." *Id*. "If not, the reviewing authority

[must then] assess" plaintiff's RFC. *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

### C. The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical

opinion of an applicant's treating physician so long as that opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*,

168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating

physician's opinion is inconsistent with the other substantial evidence in the record, "such as the

opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially

non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." Id. § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II.    The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of March, 28, 2012. (Tr. 27.) Proceeding to step two, the ALJ determined that Plaintiff has the following severe impairment: bipolar disorder. *Id*. At step three, the ALJ concluded that Plaintiff did not have an

16

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 28.) The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following non-exertional limitations: Plaintiff is limited to low stress jobs, which means no work at fixed production rate pace, with work that is checked at the end of the workday or workweek rather than hourly or throughout the day. (Tr. 28.) In reaching this conclusion, the ALJ gave "no weight" to Dr. Tice's opinions because of "the remarkable lack of support in treatment records (and, in fact, an exceptional degree of contradiction by [Dr. Tice's] records.)" (Tr. 28.) The ALJ gave "considerable weight" to Dr. Herman's, opinion because Dr. Herman's assessment was "well-supported by clinical findings including the claimant's admission that his psychological problems do not impact his activities of daily living and that it has been many years since a depressive episode and even longer since a manic episode." (Tr. 32.) Although Plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." (Tr. 32.) The ALJ determined that Plaintiff's testimony and prior statements about his daily living and mental capacities were "diametrically opposed to his assertion of mental incapacity that renders him unable to function in a work setting." (Tr. 30.) The ALJ thoroughly reviewed Plaintiff's medical records with Dr. Tice, Dr. Herman, and even Dr. Ingenito. (Tr. 30-2.) At step four, the ALJ accepted Plaintiff's testimony that his past job was too stressful for him and accordingly found that Plaintiff was unable to perform any past relevant work. (Tr. 33.) At step five the ALJ determined that considering Plaintiff's age, education, work experience, and residual functional

capacity, jobs exist in the national economy that Plaintiff can perform and thus found that Plaintiff was not disabled. (Tr. 33.)

## III.   Summary of Arguments

Plaintiff contends that the Commissioner's decision should be vacated because the ALJ failed to follow the Treating Physician Rule, and because there is no substantial evidence supporting the ALJ's RFC finding. (Pl. Mem. in Supp. at 1; 17.) Plaintiff claims that the ALJ "made no attempt to assess the requisite factors [outlined in 20 C.F.R. § 404.1527(c)] to determine how much weight to give Dr. Tice's opinion." (Pl. Mem. in Supp. at 14.) Plaintiff also points out the ALJ's failure to mention Dr. Tice's October 8, 2013 letter and to discuss the weight afforded to Dr. Ignenito's opinion in her decision. (Pl. Mem. in Supp. at 15-16.) Next, Plaintiff argues that the ALJ failed to cite any evidence of record for her finding that Plaintiff's statements concerning his symptoms are not entirely credible, and thus the ALJ's credibility determination should be reversed. (Pl. Mem. in Supp. at 17.) Lastly, Plaintiff contends that the ALJ incorrectly included the vocational expert's response to an underinclusive hypothetical question as substantial evidence.

Defendant argues that the ALJ correctly weighed the treating physician opinion, pointing to several sentences in the decision that discuss the 20 C.F.R. § 404.1527(c) factors. (Def. Mem. in Opp. at 14-15.) Defendant asserts that, despite Plaintiff's implication that no mention was made of the weight afforded to Dr. Ingenito's opinion, the ALJ did in fact consider and discuss this. (Def. Mem. in Opp. at 16.) Defendant also argues that the ALJ's credibility analysis of Plaintiff was not flawed because the ALJ considered several of the factors stated in 20 C.F.R. § 404.1529(c) and identified specific record-based reasons for her decision. (Def. Mem. in Opp. at

18.) Lastly, Defendant argues that, because the ALJ's hypothetical question matched her RFC finding, the vocational expert's response was substantial evidence. (Def. Mem. in Opp. at 19.)

## IV.     Application of Governing Law to the Present Facts

Although the treating physician rule generally requires that the treating physician's opinion be accorded controlling weight, this does not apply when, as here, the treating physician has issued opinions inconsistent with other substantial evidence in the record. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Despite Plaintiff's belief otherwise, the record supports the ALJ's conclusions that Dr. Tice's opinion lacks support in the record. The ALJ carefully considered the treating physician rule and the requisite factors, and gave record-based reasoning for her conclusion. First, she explained the inconsistency of Dr. Tice's opinion "with the record as a whole." *Halloran*, 462 F.3d at 32 (quoting 20 C.F.R. §404.1427(c)(4)). She also discussed the relevant factors to determine what weight to give it, *see* 20 C.F.R. § 404.1527(c), and gave "good reasons" for the weight given to the treating physician's opinion, *see Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009); *see also Halloran*, 362 F.3d at 32-3.

The ALJ noted Plaintiff's September 24, 2012 written statement in which he stated, among other things, that he provides emotional support for his wife and three sons, prepares meals on a regular basis, helps with all household chores, goes out all the time, has no difficulties managing his finances, is able to finish what he starts can follow instructions and has no problems with authority figures. (Tr. 29)

With respect to the undated note  containing Dr. Tice's opinion that "psychiatrically" Plaintiff was "very impaired", the ALJ noted the shortness of the relationship between Dr. Tice and Plaintiff (viz. three visits) and the lack of support in the submitted progress notes. Next, the

ALJ next discussed three progress notes of Dr. Tice's that had been submitted to her. Those notes described Plaintiff as calm, friendly, attentive, fully orientated, and with no signs of either depression or mood elevation. Dr. Tice's opined that Plaintiff had normal insight into problems, intact social judgment and cognitive functioning, and that his memory and ability to perform both arithmetic and abstract calculations were intact. (Tr. 30-31.) Additionally, Dr. Tice gave Plaintiff a GAF score of 60, indicative of only mild symptoms and or moderate difficulty in functioning. (Tr. 31.) The considerations discussed by ALJ Wexler derive from the 20 C.F.R. § 404.1527(c) factors and support her conclusion to give no weight to Dr. Tice's opinion. The law requires "no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see Brault*, 683 F.3d 443, 448 (2d Cir. 2012) ("[a]n ALJ does not have to state on the record every reason justifying a decision."). Here, it is clear that the ALJ adequately considered several of the 20 C.F.R. § 404.1527(c) factors, and did not "traverse[]" the substance of the treating physician rule. *Halloran*, 362 F.3d at 32-33, *see Rosier v. Colvin*, 586 Fed. Appx. at 758 (ALJ properly rejected treating physician's opinion where other substantial evidence in the record was inconsistent with treating physician's opinion)

Moreover, Dr. Herman's opinion provides substantial evidence for the ALJ's decision. The ALJ discussed Dr. Herman's finding that Plaintiff was capable of following and understanding simple directions and instructions, performing simple tasks, maintaining attention and concentrating, and maintaining a regular schedule. (Tr. 32.) The ALJ directly quoted Dr. Herman's conclusion that "the results of the examination . . . do not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 32.) In crediting

Dr. Herman's opinion, the ALJ noted that his assessment was "well-supported" by "Plaintiff's admission that his psychological problems do not impact his activities of daily living and that it has been many years since a depressive episode and even longer since a manic episode." Tr. 32. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.1993) (noting that the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record"); *Punch v. Barnhart*, 2002 WL 1033543, at *11–13 (S.D.N.Y. May 21, 2002) (where ALJ credited the opinion of a non-treating medical expert over that of a treating physician for the stated reasons that the treating physician's opinion was "not well supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence" in the record, the ALJ was "following the treating physician regulation rather than ignoring it," as the plaintiff claimed).

Neither ALJ Wexler nor the Appeals Council erred by not referencing Dr. Tice's October 10, 2013 letter. Although this letter was written and received prior to the issuance of her decision and she did not directly mention the letter in her decision, the letter does not afford a basis for rejecting the ALJ's conclusion regarding the weight afforded to Dr. Tice's opinion. This is especially true given the following except from the ALJ's decision discussing correspondence from Dr. Tice:

> Dr. Nancy Tice, D.O. the aformentioned recent treating psychiatrist, asserted in an undated note addressed "to whom it may concern" that "psychiatrically Mr. Ohrnberger is very impaired." Dr. Tice declared that the claimant is "unable to work responsibly or attend any kind of work related activity at this time" because he lacks impulse control, is unable to "focus to deal with the work environment: and "has difficulty with his activities of daily living and would be unable to function in any employment capacity." . . . Similarly Dr. Tice indicated very severe limitations of functional abilities in a questionnaire . . . including mood

disturbance, difficulty thinking or concentrating, behavioral abnormalities and severe limitations in virtually all vocational-related mental abilities. . . . However, progress notes show that Dr. Tice only saw claimant on three occasions. She indicates that this is evidence of severe mental capacity. She claims that the claimant would have sought her out more often if he was mentally competent. However, she is simply speculating and had no basis for this assertion. The equally plausible explanation could be that the claimant was true-to-his-word when he stated that he only wished to begin a patient-doctor relationship to maintain his prescriptions. (See Exhibit 6F, page 2). Moreover, the progress notes are diametrically opposed to Dr. Tice's assertion of near total mental incapacity.

Tr. 30. The ALJ then went to thoroughly discuss the treatment notes of the three referenced visits. With respect to the Appeals Council, it will consider new and material evidence that relates to the period on or before the date of the ALJ's decision hearing, 20 C.F.R. § 404.970(b), and it will only review the case if it subsequently finds that the ALJ's action, findings, or conclusions are contrary to the weight of the evidence currently in the record, including the new evidence. *Id*. Here, even with the October 10 letter in the record, the ALJ's action, findings, and conclusions are not contrary to the weight of the record.

Additionally, despite Plaintiff's indication that the ALJ did not discuss the weight given to Dr. Ingenito's opinion, ALJ Welxer stated, after analyzing Dr. Ingenitos's treatment records, that there was "no documentation of symptoms or limitation by [Dr. Ingenito] since prior to the alleged disability onset date." (Tr. 30.) Because Dr. Ingenito retired before Plaintiff's alleged onset date, there was no relevant medical opinion by Dr. Ingenito for the ALJ to weigh.

Plaintiff's argument that the ALJ's RFC finding is not supported by substantial evidence is equally unpersuasive. The ALJ found "that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 32.) Plaintiff argues that the ALJ did not consider the requisite factors, discussed in *Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010), when she made this decision. "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses.'" *Cichoki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). "Accordingly, where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the Court] must defer to [her] findings." *Id*. Here, the ALJ properly identified specific record-based reasons for her credibility findings and discussed the 20 C.F.R. § 404.1529(c)(3) factors when doing so.

First, the ALJ discussed Plaintiff's specific daily activities. (Tr. 29.); *see* 20 C.F.R. § 404.1529(c)(3)(i). The ALJ noted that Plaintiff "spends his days making the bed, doing laundry, watching television, cooking, and running errands," "reading, watching TV and movies, [and] caring for the family dog." (Tr. 29.) Next, the ALJ discussed the precipitating and aggravating factors of Plaintiff's disorder, noting that the stress of work caused the Plaintiff to experience panic attacks. (Tr. 29); 20 C.F.R. § 404.1429(c)(3)(iii). As such, the ALJ limited Plaintiff to low stress work in her RFC finding. (Tr. 32-33.) The ALJ next noted past medication Plaintiff had been prescribed, such as Xanax, and the medication Plaintiff was currently taking, Wellbutrin and Abilify. (Tr. 29.) The ALJ noted that Plaintiff "testified [Wellbutrin and Abilify] are working well." (Tr. 29); 20 C.F.R. § 404.1429(c)(3)(iv). The ALJ additionally noted Plaintiff's past treatment, other than medication, that he received from Dr. Ingenito and Dr. Tice. (Tr. 30-32); 20 C.F.R. § 404.1429(c)(3)(v). Thus, the ALJ considered several 20 C.F.R. § 404.1529(c) factors in

making her credibility finding.

Plaintiff also claims that the ALJ misstated the credibility analysis as requiring a claimant's assertions about his symptoms to be corroborated by objective evidence. (Pl. Mem. in Supp. 17.) In fact, the ALJ correctly stated the credibility analysis at the outset of her RFC determination. (Tr. 29.) There is no reason to believe that the ALJ did not follow her correctly stated standard when making her credibility determination.

Lastly, Plaintiff argues that the vocational expert's testimony cannot construe substantial evidence in support of the ALJ's decision because the ALJ's hypothetical question did not include all of Plaintiff's impairments. (Pl. Mem. in Supp. at 18) However, because the ALJ's RFC finding is supported by substantial evidence, and her hypothetical question precisely matched the RFC finding, the ALJ did not err by considering the vocation expert's response substantial evidence. (Tr. 49-50.)

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is denied, Defendant's cross-motion is granted, and the decision of the Commissioner is affirmed. The Clerk of the Court is directed to enter judgment in favor of defendant and to close this case.

Dated: Central Islip, New York
      August 19, 2016                        /s/  Denis R. Hurley
                                              Denis R. Hurley
                                              United States District Judge